## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

OPTOS, INC.,                 )
                                      )

        **Plaintiff,**          )
                                        )

        **v.**               )        **Civil Action No. 10-12016-DJC**
                                        )

**TOPCON MEDICAL SYSTEMS, INC.,**  )
**and BARRY SCHAFER,**         )
                                        )

        **Defendants.**         )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                   March 7, 2011

### I. Introduction

Plaintiff Optos, Inc. ("Optos") has sued its former sales account manager Barry Schafer ("Schafer"), and Schafer's subsequent employer, Topcon Medical Systems, Inc. ("Topcon"), a rival corporation, alleging breach of contract, tortious interference with contractual relations, theft of trade secrets, and unfair and deceptive trade practices. Specifically, Optos alleges that Schafer, in violation of his non-disclosure and non-solicitation agreement with Optos, improperly retained a confidential list of Optos customers and used that list to help Topcon mount a campaign to steal Optos' customers. Topcon and Schafer (collectively, "Defendants") have moved to dismiss for lack of personal jurisdiction or to transfer venue. Separately, Optos has moved for a preliminary injunction. For the reasons discussed below, Topcon and Schafer's motion to dismiss or transfer venue is DENIED and Optos' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART.

## II. Factual Background[1]

Optos is a foreign corporation incorporated under the laws of Delaware with its principal place of business in Massachusetts. Topcon is a New York corporation with its principal place of business in New Jersey. Topcon is not registered to do business in Massachusetts, but has two employees who sell directly to Massachusetts customers and derives approximately 2% of its total sales revenue from customers located in Masschusetts.[2] Both Optos and Topcon are companies that develop, manufacture and market "retinal imaging devices," which create diagnostic images of certain parts of the eye, including the retina. These devices aid in the screening, early detection and diagnosis of eye degeneration and disease, as well as other health problems that may manifest themselves in the eye, including diabetes, hypertension and certain cancers. The devices are marketed to both ophthamologists and optometrists. The market for these devices is limited; according to the parties, there are approximately 22,000 optometric practices and fewer than 8,000 ophthamology practices nationwide.

Optos provides most of its devices on a rental basis, with rental contract terms including either a fixed monthly payment or a pay-per-patient payment with a fixed minimum payment and with typical contract durations of either three or five years. Optos has rented approximately 4,000 devices worldwide, mostly in North America.

---

[1]The Court sets forth the facts as presented in Optos' complaint, all parties' responsive filings and the attachments to these filings. All facts are uncontroverted except where otherwise noted.

[2]Optos relies on Topcon's 2010 annual report to allege that this figure of approximately 2% would correspond to about $1.25 million of Topcon revenue generated annually by sales in Massachusetts. Topcon does not dispute Optos' calculations based on the annual report, but neither admits nor denies whether the figure accurately reflects Topcon's revenues from Massachusetts customers.

In February 2008, Optos hired Schafer as an Account Manager responsible for Optos' accounts in its Western Region. Optos has not specified what area was covered by the Western Region, but it is clear it did not include Massachusetts. This was Schafer's second stint as an Optos employee, having previously worked for Optos from 2000 until 2005. At all times during his employment with Optos, Schafer lived in California. Throughout his employment with Optos, Schafer had direct contact with customers, and during his time as an Account Manager, he had access to Optos' customer lists, information about customer accounts and contracts and business and marketing strategies.

On January 30, 2008, immediately prior to returning to Optos, Schafer signed a non-disclosure and non-solicitation agreement under which he agreed that he would neither reveal Optos' confidential information at any time nor use such information to injure or cause loss to Optos, and that, for one year following the termination of his employment, he would not directly or indirectly solicit or initiate business-related communications with any past or present Optos customer or prospective customer. The agreement was in consideration of Schafer's pending employment. This agreement is not the basis for the instant action.

On November 20, 2008, after nearly a year on the job, Schafer signed another Confidentiality, Non-Disclosure and Non-Solicitation Agreement ("Agreement") with Optos. The Agreement promised that Schafer would have access to confidential and proprietary information belonging to the company and stated that it was in consideration of Schafer's continued employment. This Agreement is central to Optos' complaint, and included the following relevant clauses:

> <u>Confidentiality / Non-Disclosure / Return of Property</u>: I acknowledge that, during my employment, I will be given and have access to confidential and proprietary

information belonging to [Optos] and/or its customers. I agree to maintain the confidentiality of all such confidential or proprietary information, and I covenant that I will not use or disclose such information without [Optos'] express consent. Upon termination of my employment, I will promptly return to [Optos] all of its property, including but not limited to all documents, data, [and] files . . . .

Non-Solicitation of Customers: During the Term [which, by the terms of the Agreement, began when Schafer signed the Agreement and lasted until one year after Schafer's employment with Optos terminated], I will not, directly or indirectly, solicit or initiate communications for the purpose of transacting business with (a) any present or past customer of [Optos] with which I directly interacted on behalf of [Optos] during the Term or about which I possess confidential information; or (b) any prospective customer of the Company with which I directly interacted on behalf of [Optos] during the Term or about which I possess confidential information. . . .

Applicable Law / Jurisdiction: This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without regard to the conflict of laws principles thereof. In addition, I acknowledge that, because [Optos] is headquartered in Massachusetts, and I will have regular interaction with [Optos] representatives based in Massachusetts, any dispute concerning this Agreement shall be heard by a court of competent jurisdiction within Massachusetts. By signing below, I acknowledge that I am subject to the personal jurisdiction of the Massachusetts courts . . . .

The Agreement also included a standard severability clause, stating that if any provision of the Agreement is found unenforceable, the other clauses remain in effect. The Agreement did not include a non-competition covenant.

On July 9, 2009, Schafer informed Optos that he had accepted a sales position with Topcon and would be leaving Optos. The next day, Optos sent Schafer a letter noting that Optos did not object to Schafer's departure, since Optos had no non-compete agreement with Schafer, but reminding Schafer of his continuing obligations pursuant to the Agreement.[3] Schafer terminated his employment with Optos on July 17, 2009.

In November 2009, Optos received unconfirmed reports that Schafer was using Optos

---

[3]The letter did not mention the January 30, 2008 agreement.

confidential information in his work at Topcon.  On November 12, 2009, Optos sent a cease-and-

desist letter to Topcon, notifying Topcon of Schafer's contractual obligations to Optos, informing

Topcon that Optos was aware Schafer was using confidential Optos customer information in

violation of the Agreement and seeking assurances that both Topcon and Schafer would obey the

terms of the Agreement.  Optos referenced and attached a copy of the Agreement in its letter to

Topcon.  Topcon responded in writing on November 18, 2009, stating that it took Optos' allegations

"very seriously" and reassuring Optos that "Topcon is extremely diligent and has necessary

procedures in place to ensure the protection of third party propriety rights and does not knowingly

infringe on those rights."

In late 2010, Optos was contacted by a former Topcon employee who had also once worked

for Optos and who provided Optos with copies of internal Topcon e-mails.[4]  Copies of the e-mails,

spanning April 2010 to September 2010, have been filed under seal with this Court.  Optos argues

that these e-mails, with subject lines such as "Optos," "Optos Cross Reference," and "Gift," show

that, despite Topcon's representations to the contrary, Schafer had in fact shared Optos' confidential

information with Topcon and that, at the times the e-mails were sent, Schafer and Topcon were using

this information to attempt to recruit customers away from Optos to Topcon.

Specifically, Optos alleges that Schafer kept a confidential spreadsheet that included contact

information for over 3,000 of its customers, as well as information about the prices paid by those

customers for Optos' services, the extent of each customer's usage of Optos equipment, individual

---

[4]The precise date the former employee first contacted Optos is not clear from the record.
Based on the date the former employee forwarded the e-mails to counsel for Optos and the dates
of the forwarded e-mails, it appears contact was made sometime between September 20, 2010
and November 17, 2010.

customers' complaints or service requests, and the dates when customers' contracts with Optos would expire and shared the information on that spreadsheet with Topcon. Optos alleges that Topcon and Schafer crafted a marketing and financing plan that they called the "Topcon Liberation Plan." During a series of e-mails and weekly conference calls, Topcon management praised Schafer and relied on him to teach Topcon employees how to use the information he had circulated to identify Optos customers whose contracts with Optos would soon be up for renewal and to craft sales pitches tailored to each customer, including undercutting the price that a customer paid for Optos services and addressing that customer's service needs and complaints based on their history with Optos. Topcon does not deny the existence of the Topcon Liberation Plan, but disputes that it was based on any confidential information.

At some point after September of 2010, Topcon fired Schafer.[5]

## III. Procedural History

On November 22, 2010, Optos filed the instant lawsuit against Defendants alleging breach of contract against Schafer, tortious interference with contractual relations against Topcon, theft of trade secrets against both Defendants, and unfair and deceptive trade practices in violation of Massachusetts state law against both Defendants, and seeking damages and injunctive relief. The following day, Optos moved for a preliminary injunction, seeking to enjoin Schafer and Topcon from using or disseminating any of the information or materials Schafer allegedly took, restraining them, during the pendency of the litigation, from contacting any current or former Optos customer identified in the Optos customer list, prohibiting Schafer from being employed by Topcon, and

---

[5]The record does not establish when Topcon fired Schafer. The Court was notified of Schafer's termination in a brief filed by Defendants on January 6, 2011.

requiring Schafer and Topcon to account for and return the information and materials at issue.

On December 7, 2010, while the motion for preliminary injunction was pending, Schafer and Topcon moved to dismiss or transfer venue on the grounds of lack of personal jurisdiction and improper venue, pursuant to Federal Rules of Civil Procedure 12(b)(2) and (3).[6] The matter was reassigned to this session on January 21, 2011 and the Court heard oral argument on both motions on February 16, 2011.

## III. Discussion

### A. Personal Jurisdiction

Although it is Defendants' motion to dismiss, it is the plaintiff, Optos, who ultimately bears the burden of establishing by a preponderance of the evidence that personal jurisdiction over Defendants exists. Berklee Coll. of Music, Inc. v. Music Indus. Educators, Inc., 733 F. Supp. 2d 204, 208 (D. Mass. 2010) (citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)); Pesmel N. Am., LLC v. Caraustar Indus., Inc., No. 10-10450, 2010 WL 4928034, at *2 (D. Mass. Nov. 24, 2010) (citing Adams v. Adams, 601 F. 3d 1, 4 (1st Cir. 2010)). The Court accepts as true specific facts alleged by the plaintiff, whether or not those facts are disputed, and also "add[s] to the mix facts put forward by the defendants, to the extent that they are uncontradicted." Berklee, 733 F. Supp. 2d at 208 (quoting Platten v. HG Berm. Exempted Ltd., 437 F.2d 118, 134 (1st Cir. 2006)).

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum

---

[6]The title page of Schafer and Topcon's motion states that it seeks dismissal under Rule 12(b)(1), which deals with subject-matter jurisdiction, not 12(b)(2), which deals with personal jurisdiction. This appears to be a typographical error; all the jurisdictional arguments in Topcon and Schafer's filings address personal rather than subject matter jurisdiction.

state." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 51 (1st Cir. 2002) (quotations and citations omitted). Accordingly, this Court may only exercise personal jurisdiction within the limits set by Massachusetts' long-arm statute and the Constitution. Lyle Richards Int'l, Ltd. v. Ashworth, Inc., 132 F.3d 111, 112 (1st Cir. 1997). Here, the Court "may sidestep the statutory inquiry and proceed directly to the constitutional analysis . . . because the Supreme Judicial Court of Massachusetts has interpreted the state's long-arm statute 'as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.'" Daynard, 290 F.3d at 52 (quoting "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp., 361 Mass. 441, 443 (1972)). "Constitutional limitations on the exercise of personal jurisdiction over out-of-state defendants are rooted in principles of fundamental fairness." Cossaboon v. Me. Med. Ctr., 600 F.3d 25, 32 (1st Cir. 2010) (quotations omitted). The constitutional guarantee of due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)). Jurisdiction over out-of-state defendants is thus unfair "unless 'the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there.'" Cossaboon, 600 F.3d at 32 (alteration in original) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

There are two types of personal jurisdiction: specific and general. Cossaboon, 600 F. 3d at 31. Specific jurisdiction exists where the plaintiff's cause of action arises from or relates to the defendant's contacts with the forum state. Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994). General jurisdiction is broader, and "subjects the defendant to suit in the forum state's courts 'in respect to

all matters, even those that are unrelated to the defendant's contacts with the forum.'" Cossaboon, 600 F.3d at 31 (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999).

a. Specific Jurisdiction

"The First Circuit employs a tripartite analysis to determine whether specific jurisdiction is appropriate: 1) whether the claims arise out of or are related to the defendant's in-state activities, 2) whether the defendant has purposefully availed itself of the laws of the forum state and 3) whether the exercise of jurisdiction is reasonable under the circumstances." Pesmel, 2010 WL 4928034, at *3. The first prong, relatedness, "is a 'flexible, relaxed' standard that focuses on the nexus between the plaintiff's claim and the defendant's contacts with the forum state." Id. (quoting Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 9 (1st Cir. 2009)).

To satisfy the second prong, there must be some act or series of acts "by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). The purposeful availment test "focuses on the defendant's intentionality," and "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 623-24 (1st Cir. 2001).

To determine whether the final prong, reasonableness, is met, courts in this circuit look to the so-called "Gestalt factors," including: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the

controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. Cossaboon, 600 F.3d at 33 n.3.

b. General Jurisdiction

"To justify the exercise of general jurisdiction, (1) the defendant must have sufficient contacts with the forum state, (2) those contacts must be purposeful, and (3) the exercise of jurisdiction must be reasonable under the circumstances." Cossaboon, 600 F.3d at 32.

To satisfy the first requirement, "the defendant must have sufficient contacts with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Id. (quoting Int'l Shoe, 326 U.S. at 316). "To permit the exercise of general jurisdiction, the defendant must engage in the continuous and systematic pursuit of general business activities in the forum state." Id. (citations and quotations omitted). Business activities that qualify as "continuous and systematic" contacts include "longstanding" practices of "marketing or shipping products, or performing services[,] or maintaining one or more offices" in the forum state. Id. (citing 4A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1067.5 (3d ed. 2002)).

The final two prongs of the general jurisdiction analysis - purposeful availment and reasonableness - are identical to the final two prongs of the analysis for specific jurisdiction. Harlow, 432 F.3d at 66-67.

c. Consenting to Personal Jurisdiction

Additionally, "'parties to a contract may agree in advance to submit to the jurisdiction of a given court' . . . and absent some compelling and countervailing reason [that agreement] should be honored by the parties and enforced by the courts." M/S Bremen v. Zapata Off-Shore Co., 407 U.S.

1, 11 (1972) (quoting <u>Nat'l Equip. Rental, Ltd. v. Szukhent</u>, 375 U.S. 311, 316 (1964)).

<u>2. Analysis</u>

<u>a. Personal Jurisdiction over Defendant Schafer</u>

In the Agreement, Schafer explicitly agreed that "I am subject to the personal jurisdiction of the Massachusetts courts."  For the purposes of the motion to dismiss, the parties vigorously dispute whether this provision of the Agreement is binding and enforceable on Schafer.  For the reasons set forth below, the Court finds that Schafer is bound by the Agreement in this respect and, accordingly, is subject to this Court's jurisdiction.

<u>i. Choice-of-Law</u>

The first step in determining whether Schafer's acknowledgment is binding is resolving the proper choice-of-law.  That is, whether the Court should rely on the substantive law of Massachusetts when analyzing Schafer's acknowledgment or whether, as Defendants argue, the substantive law of California ought to apply instead.  In a diversity action, the choice-of-law rules that apply are those of the forum state, in this case, Massachusetts.  <u>Klaxon v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  As a general rule, Massachusetts courts will give effect to a choice-of-law clause included in the contract itself.  <u>Roll Sys., Inc. v. Shupe</u>, No. 97-12689, 1998 WL 1785455, at *2 (D. Mass. Jan. 22, 1998); <u>see also</u> <u>Morris v. Watsco, Inc.</u>, 385 Mass. 672, 674 (1982) ("Massachusetts law has recognized, within reason, the right of the parties to a transaction to select the law governing their relationship").  However, "Massachusetts courts will not honor the parties' choice-of-law if the application of that provision:  '[1] would be contrary to a fundamental policy of a state; which has [2] a materially greater interest than the chosen state in the determination of the particular issue; and which . . . [3] would be the state of the applicable law in the absence of an

effective choice of law by the parties.'" Roll Sys., 1998 WL 1785455, at *2 (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAW § 187(2)(b) (1971)).

Here, the Agreement does include a specific choice-of-law provision, to wit: "This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts." Defendants argue that this Court should not honor that choice-of-law because doing so would be contrary to what they characterize as a fundamental policy of California, namely section 16600 of the California Business and Professional Code, which states that "[e]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Since, however, Defendants' argument fails to satisfy any of the three prongs which must be met before this Court should disregard a contractual choice-of-law clause, the Court declines to do so.

Even if section 16600 could be characterized as fundamental policy barring some non-competition agreements and a materially great interest in protecting that policy, see Roll Sys., 1998 WL 1785455, at *2, such policy is not implicated by Defendants' motion to dismiss. First, the Agreement does not include a non-competition agreement. The only restrictive covenants in the Agreement are the non-disclosure and non-solicitation provisions of the Agreement, which are significantly less restrictive than a non-compete agreement, and this Court declines to treat them as the equivalent of the restraint on trade contemplated by section 16600 in the absence of Defendants being able to point to a case where a court has found that California has a fundamental policy, as defined by Massachusetts choice-of-law rules, against mere non-disclosure or non-solicitation clauses. Second, even if such clauses were included in the ambit of California's fundamental policy as a general matter, that fundamental policy does not extend to contractual clauses that are designed

to protect an employer's trade secrets. Shipley Co., LLC v. Kozlowski, 926 F. Supp. 28, 30 (D. Mass. 1996) (citing to Muggill v. Reuben H. Donnelly Corp., 62 Cal. 2d 239, 242 (1965) (Section 16600 "invalidates provisions in employment contracts prohibiting an employee from working for a competitor . . . unless the[ provisions] are necessary to protect the employer's trade secrets")); see also Roll Sys., 1998 WL 1785455, at *2 n.1 (discussing Shipley and the trade secret exception in California policy). Here, the non-solicitation and non-disclosure clauses in the Agreement fall squarely within California's trade secret exception. The non-disclosure clause is limited to "confidential and proprietary information belonging to [Optos] and/or its customers." The non-solicitation clause does not prevent Schafer from initiating communications with *any* Optos customer, but with only those past, present or prospective customers about whom Schafer "possess[es] confidential information." Third, even if the non-disclosure and non-solicitation clauses at issue in this case were contrary to California's fundamental policy and did not fall within the trade secrets exception, they are not the clauses of the Agreement at issue in Defendants' motion to dismiss. This motion turns on Schafer's consent, memorialized in the Agreement, to be subject to the personal jurisdiction of the Massachusetts courts. Applying the personal jurisdiction clause of the Agreement would not be contrary to California's fundamental policy, and thus the first prong of the exception to the standard Massachusetts choice-of-law approach is unmet.

The second prong requires that the allegedly offended state, California, has a materially greater interest than the state chosen by the parties' choice-of-law clause, Massachusetts, in the determination of the particular issue at bar; here, Schafer's consent to jurisdiction in Massachusetts. Regardless of whether California's interest regarding the Agreement's non-solicitation and non-disclosure clauses outweighs Massachusetts' interest, there is no reason to believe that California's

interest in the jurisdictional clause would outweigh Massachusetts' significant interest in exercising jurisdiction here where both Optos and Schafer have consented to jurisdiction in the Commonwealth and the latter has allegedly breached a contract and violated both statutory and tort law at the expense of a Massachusetts corporation. See generally Roll Sys., 1998 WL 178455 (exercising jurisdiction in Massachusetts even while holding that California's interest in non-competition required the application of California law rather than the contract's choice of Massachusetts law); Shipley Co. v. Clark, 728 F. Supp. 818, 825-26 (D. Mass. 1990) (exercising jurisdiction in Massachusetts while holding that Michigan's interest in non-competition did *not* require the application of Michigan law rather than the contract's choice of Massachusetts law).

The third prong requires that the allegedly offended state, California, would be the state of the applicable law in the absence of an effective choice-of-law by the parties. Regarding cases where no choice-of-law provision applies, the Supreme Judicial Court has decided "not to tie Massachusetts conflicts law to any specific doctrine, but seek[s] instead a functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole," and looks to the Restatement (Second) of Conflict of Laws (1971) as an "obvious source of guidance." Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631-32 (1985) The Restatement sets forth seven factors relevant to the choice of the applicable rule of law in absence of a contractual choice-of-law clause or statutory guidance from the forum state. Without engaging in a step-by-step analysis of the seven factors,[7] this Court simply notes that as a holistic matter, in

---

[7]The factors are: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6(2) (1971).

the absence of the choice-of-law clause enshrined in the Agreement, and given that this provision of the Agreement does not implicate California's fundamental public policy, it cannot be said with certainty that the appropriate substantive law here would be California rather than Massachusetts law.

Massachusetts courts will enforce a contractual choice-of-law clause unless three prongs are met, Roll Sys., 1998 WL 1785455, at *2, and in this case none of the three are met. Accordingly, the choice-of-law clause is enforceable, and this Court will rely on the substantive law of Massachusetts to determine Schafer's consent to personal jurisdiction here.

ii. Schafer's Consent to Jurisdiction

Schafer's acknowledgment, memorialized in the Agreement, that "I am subject to the personal jurisdiction of the Massachusetts courts," is, under Massachusetts law, a classic formulation for consenting to personal jurisdiction. See Inso, 999 F. Supp. at 166-67. Massachusetts courts enforce these acknowledgment clauses unless the clauses are unreasonable or unfair under the circumstances. See R.E. Moulton, Inc. v. RAC Assocs., LLC, No. 09-11069, 2009 WL 4730990, at *1 (D. Mass. Dec. 8, 2009) (citing Bremen, 407 U.S. at 10). "Unreasonable or unfair" in this context means either "adhesive" - and as the Court will discuss shortly, the Agreement here is not a contract of adhesion - or something akin to "unthinkable." Bremen, 407 U.S. at 17 n.18. Here, given the lengthy and repeated discussion in the Agreement of trade secrets, it was not unthinkable to Schafer that an action bottomed on misappropriation of trade secrets could be litigated in Massachusetts.

Defendants do not necessarily dispute that the acknowledgment clause, read in isolation, is enforceable under Massachusetts law. Instead, they argue that the Agreement *as a whole* is void for

lack of consideration or as adhesive, because, they allege, the only consideration Schafer received for the obligations he undertook pursuant to the Agreement was his continued employment. The Court disagrees.

First, Massachusetts has recognized the doctrine that continued employment alone may suffice to support non-competition or other restrictive covenants. Sherman v. Pfefferkorn, 241 Mass. 468, 473 (1922); see also Econ. Grocery Stores Corp. v. McMenamy, 290 Mass. 549, 551-52 (1935) (relying on Pfefferkorn). While at least one court in this district has questioned the current validity of the doctrine, at least in the preliminary injunctive context, see IKON Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 131 (D. Mass. 1999), Massachusetts courts have subsequently reasserted the doctrine's health with regard to interpreting whether restrictive covenants in contracts are enforceable. See EMC Corp. v. Donatelli, 25 Mass. L. Rptr. 399 at *6 (Mass. Super. Ct. 2009) (noting that "to the extent that IKON stands for the proposition that, on the facts of that case, mere continuation of defendant's existing employment was not sufficient, the Court concludes that IKON does not reflect current Massachusetts law. . . . [Cases like IKON] do not abolish the doctrine that continued employment alone may suffice to support [non-competition] covenants"); Lunt v. Campbell, 23 Mass. L. Rptr. 145 at *4 (Mass. Super. Ct. 2007) ("continued employment is sufficient consideration, so that an agreement executed under such circumstances is not necessarily void on that ground alone"); see also Wilkinson v. QCC, Inc., 53 Mass. App. Ct. 1109 at *1 (Mass. App. Ct. 2001) (unpublished decision) (Massachusetts caselaw "does not suggest that imposition of a noncompetition covenant on an already employed at-will employee is unenforceable").

Second, the Agreement promised Schafer more than the bare fact of continuing at-will employment. The Agreement also promised him "access to confidential and proprietary information

belonging to the company," which may be additional consideration above and beyond continuing employment. See, e.g., EMC Corp., 25 Mass. L. Rptr. 399 at *6 (noting that "access to certain trade secrets and/or confidential and proprietary information" was evidence of consideration other than continued employment). Thus, the Agreement, including Schafer's acknowledgment of personal jurisdiction, is supported by adequate consideration and is enforceable under Massachusetts law.

Even if, as Topcon and Schafer argue, the appropriate choice-of-law governing Schafer's acknowledgment were California law instead of Massachusetts law, the acknowledgment would likely still be valid. Contrary to Schafer and Topcon's contention, the inclusion of a non-solicitation clause in the Agreement would not prevent a court following California law from enforcing the separate clause wherein Schafer subjects himself to jurisdiction in Massachusetts.

While California law, per section 16600, clearly invalidates non-competition clauses as a general matter, Edwards v. Arthur Andersen LLP, 44 Cal. 4th 937, 945 (Cal. 2008) (stating that "today in California," under section 16600, "covenants not to compete are void, subject to several exceptions"), it is not clear that this general prohibition extends to non-solicitation clauses. Compare Dowell v. Biosense Webster, Inc., 102 Cal. Rptr. 3d 1, 10-11 (Cal. Ct. App. 2009) (Second District) (refusing to reach the open question in California law of whether "section 16600 bars a court from specifically enforcing (by way of injunctive relief) a contractual clause" designed to protect trade secrets by "purporting to ban a former employee from soliciting former customers") with Ret. Grp. v. Galante, 98 Cal. Rptr. 3d 585, 593 (Cal. Ct. App. 2009) (Fourth District) (holding that section 16600 does bar injunctive relief enforcing non-solicitation clauses designed to protect trade secrets, but does not bar injunctive relief to enjoin tortious use of trade secrets).

Further, even if the non-solicitation clause were invalid, California law does not require that

the separate clause consenting to jurisdiction in Massachusetts be voided. First, section 16600 explicitly states that "[e]very contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is *to that extent* void." CAL. BUS. & PROF. CODE § 16600 (emphasis added). Although it is plausible that a non-solicitation clause could be interpreted as a restraint from engaging in a lawful profession, it does not follow that an acknowledgment of personal jurisdiction creates any such restraint. Second, the Agreement includes a severability clause. The parties have thus already agreed amongst themselves that some of the Agreement's clauses (such as the jurisdictional acknowledgment) should survive even if other clauses (such as the non-solicitation clause) are invalidated.

Schafer and Topcon nonetheless assert that under California law, illegal contracts are void, full stop, and support this broad assertion by relying on <u>Kolani v. Gluska</u>, 75 Cal. Rptr. 2d 257, 260 (Cal. Ct. App. 1998) ("[i]llegal contracts are void" and cannot be saved by judicial reformation unless "the parties have made a mistake"). But the question in <u>Kolani</u> was whether a court could save a specific non-competition *clause* by narrowing its application, not whether a court could reform or otherwise save an *entire contract* after an offending non-compete clause had been excised. <u>Id.</u> at 259-60. In any event, here, because of the Agreement's severability clause, even under California law Optos would not need to ask for the Agreement to be reformed in order to enforce Schafer's consent to jurisdiction in Massachusetts.

For all these reasons, the Court finds that it has personal jurisdiction over Schafer.[8]

b. Personal Jurisdiction over Topcon

---

[8]In the complaint, Optos relies only upon Schafer's consent in the Agreement as the basis of this Court's personal jurisdiction. Having concluded that this consent is valid, the Court does not reach Optos' later argument, raised in its briefs, that there are alternate grounds for personal jurisdiction over Schafer.

Optos alleges in its complaint that Topcon and its representatives have targeted Optos customers in Massachusetts. Optos further alleges that in its cease-and-desist letter to Topcon, Optos provided Topcon with a copy of the Agreement, and thus Topcon was aware that any violation of the Agreement could lead to litigation in Massachusetts, pursuant to Schafer's consent to jurisdiction in Massachusetts.

As previously discussed, the first prong of the three-part test for specific personal jurisdiction concerns whether plaintiff's claims are "related to or arise[] out of a defendant's contacts with the forum." Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414 (1984) (citation and quotations omitted). Here, Optos' core claim against Topcon is that Topcon tortiously interfered with the Agreement, Optos' contract with its former employee, Schafer.[9] This allegation is sufficient to establish relatedness.

The leading First Circuit case on relatedness in a tortious interference case is Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1 (1st Cir. 2009). There, the defendant corporation, a California corporation, hired Kevin Plant, a Florida resident and a former employee of the plaintiff corporation, knowing "that Astro-Med was located in Rhode Island, that Plant had entered into the Employee Agreement in Rhode Island, that the contract specified it would be governed by Rhode Island law, that the contract contained non-competition and non-disclosure provisions, and that by virtue of the contract, Plant had consented to the exclusive jurisdiction of the courts of Rhode Island over any disputes related to the contract." Id. at 10. The First Circuit was unconvinced by defendant's argument that, "because it is a California corporation and because all its direct dealings

_____

[9]As listed in Optos' complaint, the entirety of Optos' claims against Topcon are: tortious interference with a contract (Count II), theft or misappropriation of trade secrets (Count III), unfair business practices (Counts IV and VII), breach of fiduciary duty (Count V) and unjust enrichment (Count VI).

with Plant, a Florida resident, took place either in Florida or in California, jurisdiction cannot lie in Rhode Island," holding that this "emphasizes too fine a point" to hold sway in the flexible, relaxed context of personal jurisdiction. Id. Instead, the First Circuit held that the defendant "knew that by employing Plant, it was running the risk that Plant would thereby have breached his Rhode Island contract with a Rhode Island company and any ensuing suit would be initiated in Rhode Island and interpreted under Rhode Island law, " and that defendant's "conduct in Florida and California was a cause of the breach of contract - the actual injury - that occurred in Rhode Island." Id. Thus, the "in-forum injury was clearly related to Astro-Med's tortious interference claim." Id.

Astro-Med is wholly applicable to the case at bar. Here, at least after it received Optos' November 12, 2009 cease-and-desist letter and the attached copy of the Agreement, Topcon knew that by facilitating Schafer's dissemination of information about Optos' customers, Topcon was running the risk that Schafer would be in breach of the Agreement, a contract with a Massachusetts company, and that pursuant to the Agreement's terms, any ensuing suit would be initiated in Massachusetts and interpreted under Massachusetts law. Moreover, based on the e-mails Optos has filed with this Court, Topcon's allegedly improper acts continued to occur at least until September 2010. Even though Schafer and Topcon were at all relevant times located in California and New Jersey, respectively, rather than Massachusetts, their conduct in California and New Jersey was a cause of the alleged breach of the Agreement - the injury that forms the basis of Optos' claims here - that occurred in Massachusetts. This in-forum injury is clearly related to Optos' tortious interference claim. Astro-Med, 591 F.3d at 9-10.[10]

---

[10]A number of district courts have interpreted Astro-Med in this fashion. See, e.g., Risktimetry Analytics, LLC v. Altaira, LLC, No. 10-10969, 2010 WL 4450205, at *3-4 (D. Mass. Nov. 3, 2010) (relying on Astro-Med to find relatedness and minimum contacts sufficient to support specific jurisdiction where an out-of-state defendant's lone contact with

During oral argument, counsel for Topcon argued that Astro-Med was distinguishable, because Astro-Med turned on the fact that the defendant corporation "sought and obtained legal advice that by hiring Plant, it was exposing itself to some legal risk," Astro-Med, 591 F.3d at 10, and that Topcon received no analogous legal advice in this case. Although the Court appreciates the argument, the Court believes that the argument is too narrow a reading of Astro-Med given the facts of this case. The key fact for determining relatedness in Astro-Med was the fact that the defendant corporation's conduct caused in the forum state an injury - breach of contract - which served as the basis for the subsequent litigation. Astro-Med, 591 F.3d at 10. To the extent that the Astro-Med court was concerned with the defendant corporation's solicitation of advice from counsel, that concern was related to the court's purposeful availment inquiry, not its relatedness inquiry. Id. Even in the purposeful availment context, the threshold question was whether the defendant corporation "was fully aware of" the contract at issue, and whether it was "foreseeable to [defendant] that it might be held accountable for its actions in a Rhode Island forum," id. (citations and quotations removed), not whether the defendant spoke to its lawyers.

---

Massachusetts was entering into a contract with a Massachusetts corporation, and where the existence of the contract was the injury on which plaintiff's copyright infringement claim was based); Jagex Ltd. v. Impulse Software, No. 10-10216, 2010 WL 3257919, at *3 (D. Mass. Aug. 16, 2010) (relying on Astro-Med to find that contract breached in Massachusetts by an out-of-state company that did not otherwise contact Massachusetts satisfied relatedness and minimum contacts); EIQnetworks, Inc. v. BHI Advanced Internet Solutions, Inc., 726 F. Supp. 2d 26, 34 (D. Mass. 2010) (relying on Astro-Med to find relatedness where out-of-state defendant's "failure to make payments to [plaintiff] in Massachusetts, of course, constitutes the very conduct upon which the breach of contract claim is premised"); New England Coll. v. Drew Univ., No. 08-424, 2009 WL 3525596, at *5 (D.N.H. 2009) (citing Astro-Med for the proposition that "intentional interference with an in-forum contract or business relationship can establish jurisdiction" and finding jurisdiction over an out-of-state defendant whose out-of-state actions "were both intended to and did have a significant impact on an established competitor in New Hampshire, such that [the defendants] could reasonably expect to be haled into this forum to defend its actions").

In any event, here, the record indicates that Topcon *did* speak to its lawyers. On November 12, 2009, Optos sent Topcon a cease-and-desist letter and attached a copy of the Agreement; Topcon responded on November 18, 2009, with a letter from its assistant general counsel stating that she had reviewed the cease-and-desist letter, that Topcon took the allegations therein very seriously, and that Topcon had procedures in place to ensure the protection of Optos' propriety rights. Topcon's situation vis-a-vis its counsel is not appreciably different from that of the defendant in Astro-Med.

For all these reasons, the Court finds that the relatedness prong of this Court's specific personal jurisdiction over Topcon is met.

"To satisfy the second requirement, 'the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.'" Astro-Med, 591 F.3d at 10 (quoting N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005)). Here, at least as of November 12, 2009, when Topcon received a copy of the Agreement attached to Optos' cease-and-desist letter, Topcon knew full well that the Agreement included Schafer's consent to subject himself to jurisdiction in Massachusetts, and that any benefits it received as a result of using Optos' confidential information could involve Topcon in litigation in Massachusetts.[11] That is sufficient to establish purposeful availment.[12]

_____

[11]Optos has submitted affidavits and copies of e-mails suggesting that the confidential information was circulating among Topcon staff at least as late as September 2010, nearly a year after Topcon's receipt of Optos' cease-and-desist letter.

[12] Again, Topcon's assertion that, because Optos has not alleged that Topcon specifically sought advice from counsel regarding liability, Astro-Med should not apply, is not persuasive in consideration of the purposeful availment prong of jurisdictional analysis. First, again, Topcon *did* talk to its lawyers. More importantly, though, the issue is whether Topcon knew that breaching the Agreement could lead to litigation in Massachusetts, not whether Topcon sought legal advice. The Court thinks that, even without expert legal advice, Topcon could have

The third prong, reasonableness, requires the Court to determine whether the gestalt factors tip in favor of jurisdiction. Again, factors in this gestalt determination include (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. Cossaboon, 600 F.3d at 33 n.3. The first factor "is only meaningful where a party can demonstrate some kind of special or unusual burden," usually meaning some hardship above and beyond the typical "burdens of litigating in another forum." Pritzker, 42 F.3d at 64 ("In the modern era, the need to travel between New York and Puerto Rico creates no especially ponderous burden" and does not trigger the first factor). Here, requiring a New Jersey company that does business in Massachusetts to appear in Massachusetts courts "is not an overwhelming burden." Gary Scott Int'l, Inc. v. Baroudi, 981 F. Supp. 714, 717 (D. Mass. 1997). The second factor supports jurisdiction since "Massachusetts has an interest in adjudicating this dispute because one of its corporate residents has allegedly been the victim of misappropriation." Abiomed, Inc. v. Turnbull, 379 F. Supp. 2d 90, 96 (D. Mass. 2005). As to convenience, as discussed more fully below in the Court's venue analysis, there is little reason to believe that it would be inconvenient for any non-parties who may be called as witnesses or otherwise assist the Court to appear in Massachusetts, and absent some such factor, the Court "must accord plaintiff's choice of forum a degree of deference in respect to the issue of its own convenience." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 211 (1st Cir.1994). As to effectiveness of relief and resolution of the case, no party has suggested that this Court, properly vested with personal jurisdiction, would

---

determined for itself the meaning of the Agreement's clause stating that "any dispute concerning this Agreement shall be heard by a court of competent jurisdiction within Massachusetts."

have difficulty providing effective relief, injunctive or otherwise. Finally, while California may have some interest in promoting its substantive employment laws (i.e., its disfavoring of non-compete agreements), for all the aforementioned reasons and for the reasons discussed in the Court's venue analysis below, the consideration of the common interest of all sovereigns in promoting substantive social policies does not tip against jurisdiction here. Exercising personal jurisdiction over Topcon in this case would be reasonable.

Because Optos' claims arise out of Topcon's contact with Massachusetts, Topcon purposefully availed itself of the forum, and it would not be unreasonable for this Court to exercise personal jurisdiction over Topcon, the Court finds that Topcon has "minimum contacts [with Massachusetts] sufficient to establish specific jurisdiction." Cossaboon, 600 F.3d at 32 (quotations and citation omitted).[13]

### B. Venue

If a case is brought in a federal district court where venue is improper, that court must either dismiss the case, or, if in the interest of justice, transfer the case to a proper venue. 28 U.S.C. § 1406(a). See also FED. R. CIV. P. 12(b)(3). Even when a case is brought in a proper venue, a court may nonetheless transfer the case to any other proper venue for the convenience of parties and witnesses and in the interest of justice. 28 U.S.C. § 1404(a). Topcon and Schafer ask this court to either dismiss this case for improper venue or to transfer the case to the Southern District of California. Venue is proper in this Court and the Court will not dismiss or transfer the case.

In a diversity action, venue is proper in "a judicial district in which a substantial part of the

---

[13]Because the Court has concluded that it has specific jurisdiction over Topcon, the Court need not determine whether it would have general jurisdiction over Topcon, which would require continuous and systematic business contacts between Topcon and Massachusetts. See Cossaboon, 600 F.3d at 32; see also Astro-Med, 591 F.3d at 9.

events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a)(2). In determining whether a given judicial district is a "district in which a substantial part of the events occurred," courts in the First Circuit look "not to a single 'triggering event' prompting the action, but to the entire sequence of events underlying the claim," an approach which "takes a holistic view of the acts underlying a claim." Astro-Med, 591 F.3d at 12 (quotations and citations omitted). "Furthermore, we are not required to determine the best venue, merely a proper venue." Id.

In this case, venue is proper in this district. Although Schafer's misappropriation of Optos' trade secrets arguably occurred in California, outside this judicial district, that misappropriation was merely the "triggering event" prompting Optos' complaint; the entire sequence of events includes Schafer accessing those alleged trade secrets from computer servers in Massachusetts and acquiring additional confidential information on a thumb drive sent to him from Massachusetts. One of the two parties to the Agreement central to this case is, and was at all times relevant to this litigation, resident in Massachusetts. Optos and Schafer executed an agreement identifying Massachusetts as the forum for litigating all claims arising out of the contract. Accordingly, Massachusetts is a proper venue. See Astro-Med, 591 F.3d at 12 (venue proper in state where factual predicate for tortious interference took place, where plaintiff had its headquarters, and where the contract at issue chose the state in its forum selection clause).

When considering whether to grant a motion pursuant to 28 U.S.C. § 1404 to transfer from a proper venue, courts consider (1) the convenience of the parties, (2) the convenience of the witnesses, (3) the relative ease of access to sources of proof, (4) the availability of process to compel attendance of unwilling witnesses, (5) cost of obtaining willing witnesses, and (6) any practical

problems associated with trying the case most expeditiously and inexpensively.  See F.A.I. Elec.

Corp. v. Chambers, 944 F. Supp. 77, 80-81 (D. Mass. 1996) (citing Gulf Oil Corp. v. Gilbert, 330

U.S. 501, 508 (1947)).  "Of those factors, the convenience to the expected witnesses is probably the

most important factor, and the factor most frequently mentioned."  Fairview Mach. & Tool Co., Inc.

v. Oakbrook Int'l., Inc., 56 F. Supp. 2d. 134, 141 (D. Mass. 1999) (citations and quotations omitted).

At this stage of the proceedings, with the exception of Defendants, no witnesses have been

identified for whom this district would be an inconvenient venue.[14]  Also relevant to this Court's

analysis are the following conclusions reached by the Court:  the venue proposed by Schafer and

Topcon, the Southern District of California, would, in the Court's opinion, be more inconvenient

to both Topcon (which is resident in New Jersey) and to Optos (which is resident in Massachusetts)

than proceeding before this Court; the Court anticipates that it will not be difficult for the parties and

this Court to access all proof necessary for this matter; the parties have not identified any unwilling

witnesses who reside outside of Massachusetts or whose attendance could not be compelled by this

Court, nor have they suggested that the cost associated with obtaining willing witnesses would be

more burdensome in this district than in the Southern District of California; and nothing about the

current venue suggests any practical problems associated with trying the case expeditiously and

inexpensively.  For all these reasons, the Court finds that transfer would further neither convenience

nor the interest of justice, and, accordingly, the Court opts not to transfer the case.

---

[14]The record does not show the state of residence of the former Topcon employee who
provided Optos with internal Topcon e-mails showing the use of Optos' allegedly confidential
information, although all parties agree the ex-employee is not a resident of Massachusetts.
Topcon and Schafer argue that the ex-employee will likely be called as a witness in this case and
that this district would be inconvenient for him.  There has been no suggestion that the ex-
employee is unwilling to participate in these proceedings or that his participation would hinge on
the Court's subpoena power.

C. Preliminary Injunction

Having concluded that this Court has personal jurisdiction over Defendants and that venue is proper in this district, the Court turns to Optos' motion for a preliminary injunction. The appropriateness of issuing a preliminary injunction turns on four factors: (1) the movant's probability of success on the merits, (2) the likelihood of irreparable harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no injunction issues and the harm to the objectors if one does issue, and (4) how the granting or denial of an injunction will interact with the public interest. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002).

Optos seeks to enjoin Schafer and Topcon from using or disseminating any of the information or materials Schafer allegedly took from Optos, restraining Schafer and Topcon during the pendency of the litigation from contacting any current or former Optos customer identified in the Optos customer list, prohibiting Schafer from being employed by Topcon, and requiring Schafer and Topcon to account for and return the information and materials at issue. The requested preliminary injunction seeks injunctive relief as to only three of the claims or subsets of claims identified in Optos' complaint: the subset related to tortious misappropriation of trade secrets (Counts III, IV and VII, asserted against both Schafer and Topcon), breach of contract (Count I, against Schafer only), and tortious interference with contractual relations (Count II, against Topcon only).

1. Likelihood of Success on the Merits

a. Claims Regarding Tortious Misappropriation of Trade Secrets

Under Massachusetts law, a plaintiff must establish three elements to demonstrate tortious

misappropriation of a trade secret: 1) the information at issue must constitute a trade secret, 2) the plaintiff must have taken reasonable steps to secure the confidentiality of the trade secret, and 3) the defendant must have used improper means to obtain the trade secret. <u>Sutra, Inc. v. Iceland Express</u>, No. 04-11360, 2008 WL 2705580, at \*3 (D. Mass. July 10, 2008). Although Optos does not allege that Topcon itself took trade secrets from Optos, Topcon may nonetheless be exposed to liability on this claim, since, "[u]nder Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." <u>Data Gen. Corp. v. Grumman Sys. Support Corp.</u>, 795 F. Supp. 501, 507 (D. Mass. 1992).

<u>i. Was the Customer List a Trade Secret?</u>

Under Massachusetts law, a trade secret is a 1) "secret," that is 2) "used in one's business," and that 3) "gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use" the secret. <u>J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.</u>, 357 Mass. 728, 736 (1970) (quoting RESTATEMENT; TORTS § 757 comment (b)). "A trade secret may consist of any formula, pattern, device or compilation of information . . . . [including] a list of customers." <u>Id.</u> The parties do not dispute that Optos used its customer list in business, or that a rival retinal imaging devices business that lacked the detailed information contained in the list would be at a competitive disadvantage (at least as to Optos' customers). Instead, Topcon and Schafer argue that the information in the list was readily available to the public rather than secret.

"The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." <u>Healy</u>, 357 Mass. at 736 (quoting RESTATEMENT; TORTS § 757 comment (b)). Whether or not a given set of business

information is secret "depends on the conduct of the parties and the nature of the information" rather than on any hard and fast rule, Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972), but there are six factors of relevant inquiry:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Id.

Topcon and Schafer rest primarily on the sixth factor, arguing that since Optos' public website provides the name and address of Optos customers, the remaining information acquired by Schafer - customer contact information beyond mere name and address information, the length of individual customer contracts, the size of customers' monthly fees, the number of patients seen by customers, the number of scans performed by Optos equipment, and specific customer service issues identified by customers - could be easily acquired by contacting each Optos customer directly and asking them for the information. Such an argument is not easy to square with the facts of this case. Topcon and Schafer acknowledge in their briefs that it would be "practically impossible" for someone to "familiarize themselves with the 3500 businesses on the [Optos customer] list," not to mention contact each individual business and convince the proprietor to disclose information about the cost, duration and substance of his or her rental relationship with Optos. Moreover, even the initial step of compiling a comprehensive list of the names and addresses of Optos' customers would be difficult; since searches on Optos' website are limited by zip

code, compiling a comprehensive list would require methodically entering each zip code in the country, one at a time.

The other five factors also tip in favor of treating Optos' customer list as a trade secret. Topcon and Schafer do not allege that the Optos customer list, in its entirety, is known outside of Optos. Optos limited access to the customer list to a subset of Optos employees and required all of its new employees to sign confidentiality agreements, whether or not they would have access to the confidential information; Schafer himself not only signed a confidentiality agreement when he started working with Optos, but again during the course of his employment. Finally, the considerable amount that Optos knows (and that rival corporations do not know) about the individual needs and histories of Optos' customers confers a significant competitive advantage on Optos and Optos alleges that its customer information was gathered and compiled by Optos at considerable cost. At this preliminary stage of litigation, at least, it seems likely that Optos will be able to establish that its customer list is a trade secret.

### ii. Did Optos Take Reasonable Steps to Secure the Confidentiality of the Customer List?

To determine whether a company took reasonable steps to protect its trade secrets, courts consider "1) the existence or absence of a [confidentiality agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 29 (D. Mass. 2004). "[T]he standard is reasonableness, not perfection," id. at 30; a company need not take "heroic measures" to preserve the confidentiality of its trade secrets. USM Corp. v. Marson Fastener Corp., 379 Mass.

90, 101 (1979).

Here, Optos' precautions meet the reasonableness standard. Again, all Optos employees sign confidentiality agreements, and Schafer himself signed more than one. Optos password-protected its computers and limited internal access to the information on the customer list. As already discussed, the information in the customer lists was not readily ascertainable outside of Optos. Finally, the information was only disclosed to Topcon pursuant to a breach of Schafer's Agreement with Optos - an agreement which Optos made Topcon aware of through a cease-and-desist letter as soon as Optos thought that Schafer might have breached it.

Topcon and Schafer argue that Optos' precautions were insufficient because Optos password-protected its *entire* computer system but did not specifically password-protect the customer list information. The Court thinks this is the type of heroic effort that Optos is not required to make under Massachusetts law. Topcon and Schafer also argue that Schafer did not know that the customer list information was confidential, but Schafer acknowledged his receipt of and responsibility for understanding the Optos Employee Handbook, which explicitly states that customer account information and customer lists is confidential. Accordingly, at this preliminary stage of litigation, it seems likely that Optos will be able to establish that it took reasonable steps to protect the information at issue.

### iii. Did Schafer Use Improper Means to Obtain the Customer List?

As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means. Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F. 3d 1147, 1165 (1st Cir. 1994) (abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick, 130 S. Ct. 1237 (2010)); Picker Int'l. Corp. v. Imaging Equip. Servs, Inc., 931 F. Supp. 18, 36 (D. Mass. 1995) (applying

<u>Data Gen. Corp</u>.).  A party who knowingly benefits from the breacher's trade secret bounty is also liable.  <u>Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.</u>, 381 Mass. 1, 5-6 (1980).  Schafer and Topcon do not dispute that, if the list is a confidential trade secret, then Schafer used improper means to obtain it.  Accordingly, the Court finds that Optos is likely to succeed on this prong of its misappropriation of trade secrets claims, and thus it seems likely, at this preliminary stage, that Optos will succeed on those claims in their entirety.

   <u>B. Claims Regarding Breach of Contract and Tortious Interference with Contractual Relations</u>

   Optos alleges that Schafer's conduct is a breach of the Agreement.  Topcon and Schafer's only defense against this allegation is that the customer list information is not a confidential trade secret, so Schafer's conduct in keeping the list did not violate the Agreement.  Because, as discussed above, the Court anticipates that this argument will likely fail and that Optos' tortious misappropriation claims will likely succeed, the Court needs no further analysis to conclude that Optos' breach of contract claim is also likely to succeed.

   Optos also alleges that Topcon's participation in Schafer's breach constitutes tortious interference with contractual relations.  To succeed on such a claim, "the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."  <u>G.S. Enters, Inc. v. Falmouth Marine, Inc.</u>, 410 Mass. 262, 272 (1991).  Here, Topcon hired Schafer and, despite having being put on notice through Optos' November 12, 2009 cease-and-desist letter of the confidentiality of the Optos customer list, subsequently encouraged him to use the list to help other Topcon sales

representatives peel away Optos customers, conduct that would harm Optos. Topcon and Schafer's only defense is that the customer list was not a trade secret and thus Schafer did not violate his contract. As discussed above, this argument is likely to fail; the Court needs no further analysis to find that Optos is likely to prevail on its tortious inteference with contract relations claim.

2. Irreparable Harm

The likelihood of irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004). "When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005). See also TouchPoint, 345 F. Supp. 2d at 32 (misappropriation of trade secrets creates presumption of irreparable harm); Picker, 931 F. Supp. at 44 (same).

Even if irreparable harm were not presumed as a matter of law, the Court would find the likelihood of such harm in this case. Although Defendants point to the fact that Optos has not identified any individual customer who has left Optos for Topcon, this argument is insufficient to dislodge the legal presumption of irreparable harm in trade secrets cases generally and the other record evidence of the likelihood of irreparable harm here. The Defendants' actions established a plausible threat of future Optos customer defections and the damages associated with those defections may escape accurate measurement, both because it will be difficult to ascertain whether the defections are the result of Topcon's solicitation or of other factors, see CTC Commc'ns, Inc. v. Bell Atl. Corp., 14 F. Supp. 2d 133, 146 (D. Me. 1998), and because the defections may affect Optos' goodwill. See Boch Enters., Inc. v. Downing, No. 961116D, 1996 WL 1250623, at *1

(Mass. Super. Ct. Mar. 6, 1996). Further, Defendants' actions could undermine Optos' business relationships with its customers and erode Optos' market share in a limited market comprised of approximately 22,000 optometric practices and fewer than 8,000 ophthamology practices nationwide. These are precisely the types of claims that have been found to independently buttress the legal presumption of harm in trade secrets cases. See Schawbel Corp. v. Conair Corp., 122 F. Supp. 2d. 71, 83-84 (D. Mass. 2000) ("[e]ven apart from the presumption of irreparable harm, the loss of market share and business relationships due to infringement may independently constitute harm," especially where "there is a limited market for the[] products" at issue).

### 3. Public Interest

A preliminary injunction is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003). Massachusetts has a clear public policy in favor of strong protections for trade secrets. See Jet Spray Cooler, 377 Mass. at 166 n.8. The Court is unpersuaded by Topcon and Schafer's argument that, as a matter of public interest, Massachusetts' public policy is outweighed by the interest of optometrists and ophthamologists to have the widest possible choice of retinal imaging products. Topcon and Schafer also argue that an injunction would violate *California*'s public policy in favor of employees' freedom to contract, as set forth at section 16600 of the California Business and Professional Code. Given the Court's determination that Massachusetts law prevails in this case, and the fact that it is not clear that Topcon and Schafer are correct in their assertion that California public policy would disfavor injunctive relief here, see Liberty Mut. Ins. Co. v. Arthur J. Gallagher & Co., No. C94-3384, 1994 WL 715613, at *2 (N.D. Cal. Dec. 19, 1994) (strong California policy per section 16600 admits a "narrow judicially-created exception" to prevent

"unfair competition, such as the unauthorized use of trade secrets or confidential information"), the Court rejects this argument and finds no friction between the public interest and the issuance of a preliminary injunction in this case.

### 4. Balance of Hardships

"Any potential harm caused to [Optos] by a denial of its motion must be balanced against any reciprocal harm caused to [Topcon and Schafer] by the imposition of an injunction." TouchPoint, 345 F. Supp. at 32. Here, Optos' proposed preliminary injunction would, during the pendency of this litigation, 1) bar Topcon and Schafer from using or disseminating Optos' trade secret information, 2) require Topcon and Schafer to provide a complete accounting of all the information and materials Schafer gave to Topcon and to return the information to Optos, 3) bar Schafer, Topcon, and all Topcon employees from contacting any current or former Optos customer identified in the information and materials Schafer gave to Topcon, and 4) bar Schafer from working for Topcon. Optos alleges that in the absence of this relief, the 3,000-plus retinal imaging device customers included in Optos' confidential customer list may defect to Topcon. Topcon and Schafer argue that the injunction as proposed is overbroad, and, at least with regard to the third prong of the proposed injunction,[15] the Court agrees.

Optos and Topcon are different companies with different product lines. Optos' business focuses almost exclusively on retinal imaging devices. Topcon, on the other hand, sells a much broader array of devices, roughly 90% of which do not compete with any product sold or leased by Optos. The parties agreed at oral argument that many of the customers on Optos' confidential list

---

[15]Based on the parties' statements at oral argument, it appears that Topcon and Schafer have already substantially complied with, or do not object to complying with, the first, second and fourth prongs of the proposed injunction.

have business relationships simultaneously with both Optos (for retinal imaging devices) and with Topcon (for other products), and that even customers on the list who do not currently buy products from Topcon may ordinarily be solicited by Topcon as potential customers not only of retinal imaging devices but also of the 90% of the Topcon product line that is not in competition with Optos. The injunction as presently drafted would prevent Topcon from communicating with its current and future customers even for the purposes of selling products that in no way compete with Optos. The Court agrees with Optos that, preliminarily at least, Topcon should be enjoined from luring away Optos' existing customers for retinal imaging devices, but the Court also agrees with Topcon that the proposed injunction would cause undue hardship to Topcon's existing and potential business relationships to the extent these relationships do not compete with Optos.

Topcon has also expressed concern that its sales representatives may be simply unable to comply fully with the proposed injunction, because Topcon sales representatives attend conferences and trade shows where they may market Topcon retinal imaging products to large groups of prospective customers without knowing whether any of those customers are on Optos' confidential list. At oral argument, Optos assured the Court that it would not ask this Court for contempt enforcement for such incidental contact between Topcon staff and Optos customers. While the Court appreciates this reassurance, the hardships would be more appropriately balanced if the scope of the order were more narrowly drawn than as proposed by Optos.

Accordingly, to the extent that Optos has sought an order to enjoin Defendants' contact with Optos customers outside of solicitation regarding retinal imaging devices, that order is DENIED. Also, to the extent that Optos seeks an order barring Schafer from working for Topcon or barring Topcon from employing Schafer, that order is DENIED as moot. The Court shall issue an order that

enjoins Topcon from using or disseminating Optos' trade secret information (namely, the customer list information); requires Topcon and Schafer to provide a complete accounting of all the trade secret information that Schafer gave to Topcon and to return same to Optos; and enjoins Topcon and Schafer from actively soliciting current Optos customers identified in the customer list for the purpose of retinal imaging device business during the pendency of this litigation. The Court will consider a joint proposal from the parties regarding the text of such an order. Accordingly, the Court orders the parties to confer and file within seven days a joint modified preliminary injunctive order. To the extent that the parties cannot reach an agreement on the precise text of the order, the joint proposal shall identify the areas of dispute and each party's preferred text with regard to each disputed area.

## IV. Conclusion

For the reasons discussed above, Defendants Topcon and Schafer's Motion to Dismiss or Transfer Venue is DENIED, and Plaintiff Optos' Motion for Preliminary Injunction is GRANTED IN PART and DENIED IN PART. Within seven days, the parties shall submit a joint filing to this Court consistent with the parameters discussed above.

**So ordered.**

/s/ Denise J. Casper

United States District Judge